JOHN REAL, plaintiff in error, *vs.* THE PEOPLE, defendants in error.

Although the statute directs (3 *R. S.* 303, §§ 6, 7, *5th ed.*) that courts of sessions shall send all indictments, not triable therein, to the next court of oyer and terminer, there to be determined according to law; and that such courts may, also, by an order to be entered in their minutes, send all indictments for offenses triable before them, which shall not have been heard and determined, to the next court of oyer and terminer, to be there determined according to law, it does not necessarily require that the prisoner shall be tried during the next session of the court, and if not then tried, that he shall not be tried at all.

The language of the statute does not necessarily require that the trial shall take place at any particular term or session; but still leaves the control of the calendar with the presiding judge; who retains the power which every judge necessarily possesses, of reserving the case, or postponing the trial for another term or session, as the exigencies of the occasion, or as justice may require.

Hence it is not necessary that the judgment record should show, on its face, when the next term of the court of oyer and terminer was held, after an indictment was sent to that court by the court of sessions.

Evidence of what the prisoner said to a policeman, the day after being arrested for the offense, is inadmissible; such declarations being no part of the *res gestæ*.

The mere apprehension of danger, followed by no *overt* act, does not justify the killing of the person from whom the danger is apprehended. Hence, on the trial of an indictment for murder, evidence of what the deceased had said to the witness about the prisoner, some time previous to the commission of the offense, is inadmissible, when offered for the purpose of showing, with other facts, whether, at the time of the occurrence, the prisoner was justified by the circumstances, in apprehending danger from the deceased.

Nor will previous bad treatment, any more than previous threats, justify homicide. Therefore, evidence to show the previous cruelty of the deceased, to the prisoner, in clubbing him when nearly insensible from intoxication, is inadmissible.

Although a prisoner may show that at the time the offense was committed he was laboring under *delirium tremens*, the opinion of a non-professional witness as to the general soundness or unsoundness of the prisoner's mind a short time before the commission of the offense, is inadmissible.

On a trial for murder, the counsel for the prisoner offered to prove that the prisoner was addicted to hard drinking; that he sometimes drank to great excess, and continued on drunken sprees for days and weeks at a time, and had had delirium and insanity. In reply to a question of the court, the counsel stated that he did not propose to show by the witness that within

two or three days previous to the homicide the prisoner had one of those fits on him; but proposed to lay a foundation to prove it. The court ruled out the question; afterwards telling the counsel that if he could show that the prisoner had *delirium tremens* at or about the time of the homicide, he could show it by this or any other witness. The counsel remarked that he proposed to show the drinking, first. *Held* that the question was properly ruled out.

Where a witness, having admitted, without due exception on the part of the prisoner's counsel, that he had been in the penitentiary, was asked how long he was there; *Held* that this was not calling for proof of his conviction, which could be proved only by the judgment record; and that he having admitted, without exception on the part of the prisoner's counsel that he had been there, an answer showing the duration of the time of his imprisonment was, if it was capable of producing any effect, calculated merely to disparage him, and was therefore admissible.

Where an indictment charged, in substance, that the prisoner made an assault, and with a pistol charged and loaded with gunpowder and a leaden bullet, fired at the deceased, and then and there feloniously &c. did strike, penetrate and wound the deceased with the leaden bullet, causing a mortal wound, of which he died; *Held* that this the prosecutor was bound to prove; but it mattered not which of the bullets, and which of the wounds, caused the death of the deceased.

Accordingly *held* that the court did not err in refusing to charge the jury that if the proof failed to show which wound it was that actually killed the deceased, the case was not made out according to the indictment.

The doctrine that the court shall disregard any error or defect in the pleadings or proceedings which has not affected the substantial rights of the adverse party, and that no judgment shall be reversed or affected by reason of such error or defect, is salutary and just, equally in criminal as in civil cases.

WRIT of error to the court of oyer and terminer for the county of New York, to review a conviction for murder in the first degree.

The indictment was for killing John Smedick, a patrolman, in the city of New York, on the night of July 23, 1868. It was found in the following month, in the court of sessions, and was, on the 6th of August, 1868, on motion of the district-attorney, sent to the court of oyer and terminer for trial, where it was tried, at the February term, 1869, before Hon. GEO. G. BARNARD, justice, and a jury.

Various exceptions were taken, on the trial, which are

stated in the opinion of the court and in the points of the prisoner's counsel.

*B. K. Phelps, S. H. Stuart* and *John Graham*, for the plaintiff in error. I. The judgment record shows that the indictment was presented in the court of general sessions, for this county, on the first Monday of August, 1868; that it was ordered into the court of oyer and terminer on August 6, 1868, and that it was sent to, and received by, the latter court on February 1, 1869. The record says, as the statute required, (3 *R. S.* 303, § 7, *5th ed.,*) that the indictment was ordered to be sent to the next court of oyer and terminer to be held, &c., to be there determined according to law. It is not alleged that the next court of oyer and terminer sat on February 1, 1869, and it was conceded on the trial that the next court of oyer and terminer sat in October, 1868. The right of the court of oyer and terminer to receive and entertain the indictment, depended upon its being the next court of oyer and terminer after August 6, 1868. (*Banks* v. *Goodwin,* 3 *Best & Smith,* 548. 113 *Eng. Com. L.* 546.) Even assuming that if the indictment had been received by the next court of oyer and terminer in this county, (i. e. in October, 1868,) it could have continued the indictment for trial to February 1, 1869; it could not begin a jurisdiction in February, 1869, which the statutes imperatively said must commence in October, 1868. This defect appearing upon the face of the judgment record, is available upon a writ of error. (1 *Chitty's Cr. Law,* 751, 752, *m. p.*) As to objection to jurisdiction, when to be taken advantage of, see *The Queen* v. *Heane,* (4 *Best & Smith,* 947; 116 *Eng. Com. L.* 945;) *McCann* v. *The People,* (6 *Park. Cr. Rep.* 629.) The court of oyer and terminer is a permanent and continuous court, existing in its appointed and stated terms. (*Quimbo Appo* v. *The People,* 20 *N. Y. Rep.* 531.) If the term after the next term would satisfy the statutes and the order of the general ses-

sions, time would be entirely unimportant, and the whole future would remain open to comply with the duty. As the statutes create the right of transmission from one court to another, the details they prescribe are the only true mode.

II. The same ground was virtually taken by the prisoner's counsel, at the outset of the trial, as an objection to the right of the court to proceed with the trial, and is presented upon an exception to the adverse ruling of the court.

III. The judgment record should have shown, on its face, when the next term of the court of oyer and terminer in this county sat, after August 6, 1868. This it does not do. One great object of the record is to make it appear that from first to last, in the condemnation of the prisoner, *servato juris ordine.*

IV. The court, at the trial, erred in preventing the prisoner's counsel asking officer Mee, who made the arrest, what reason the prisoner assigned for his act. It will be seen that the officer was not positive that the prisoner did not state the reason to him on the night, and at the time, of the arrest. He knew that the prisoner told him the reason, but he would not be positive as to time. It may have been the night of the arrest, or the next day—as likely the former as the latter. The officer had previously stated that the prisoner admitted the deed, in a way not likely to help him, if he was in a perfectly sane state of mind. It was all important, therefore, to furnish to the jury some kind of counteractive for this admission. The language of the prisoner's counsel, in seeking to introduce in evidence the reason for the deed, as given by the prisoner, was as follows: "Now I ask permission that I may ask the witness what the prisoner said the next day." The meaning of this was, that permission was desired to ask the witness what reason the prisoner assigned for his act, because it was as fair, from officer Mee's testimony, to presume that he said it on the night, and at the time

of the arrest, when he admitted the act itself, as that he said it the next day. It may be that the two things were a part of the same conversation, and if they were, as the prosecution had introduced one, the defense were entitled to bring in the other. The court had no right to assume that the reason for the act was not stated by the prisoner until the next day, because that was saying what the witness was unwilling to testify to. The evidence should have been received, and when the court came to charge the jury, it should have told them that they should entertain it, or not, according as they believed the reason for the prisoner's act was a part of the conversation the prosecution had called for, or not. The peculiarity of the prisoner's situation must be kept in view. If the evidence of James Rowe and Thomas Mulhare, for the defense, was at all true, on the day of this homicide the prisoner could not have been in his right mind. Was the craziness he gave vent to, on the night of his arrest, to come in judgment against him, unrelieved by what he said on the following day, assuming, but not conceding, that he assigned no reason for his act until the following day? Our ground is this; that the John Real who acted and spoke on the night of this occurrence, was not the real John Real; that it was a man who had been him once, and might likely be him again, but who, at the time of the homicide, was so frenzied and maddened from some cause or other, that, if the law visited accountability upon him for his *hand*, it did not allow him to be prejudiced by his *tongue*. Captain Allaire admitted he was very much excited in the station-house. What was he excited about? Was it frenzy—madness? Or was it an excitement the deceased had thrown him into, by the provocation which produced the death of the deceased? Does the law receive the statement of a man who knows not what he says, and not allow it to be offset or qualified by what he may say when it is safer to assume that reason has more or less

control over him? There may be some doubt as to whether, assuming the prisoner to have been perfectly rational on the day and night of the homicide, what he said at the station-house, when he had been arrested and carried there by an officer on a charge of murder, could be proved against him. He was then under examination by the sergeant at the desk. *The People* v. *McMahon* (15 *N. Y. Rep.* 384) is a controlling authority upon this point, where the party accused has been sworn as a witness, and his previous statement is invoked against him upon his trial. If a sworn statement is inadmissible under such circumstances, it is difficult to see why an unsworn statement ought not to be, when the principle of the rule is, that what a person so situated says is entirely unreliable, from the hopes and fears necessarily crowding his bosom. Although the prisoner's counsel did not except to the reception of what he said at the station-house, if there is a doubt as to whether the evidence was proper, it is good to strengthen the present point. The case of *The People* v. *Wentz*, (37 *N. Y. Rep.* 303,) involving the principle of the competency, as evidence, of confessions to a policeman, contains the latest law on that subject.

V. The next exception in order arose under the following circumstances: Bernard McGill, a witness for the prisoner, was asked to state what the deceased said to him about the prisoner in the latter part of June, or about the first of July, 1868, at which time the witness stated he had a conversation with the deceased, relative to the prisoner. When this question was put to the witness, the record discloses the following state of facts: (District-attorney objects.)

"Mr. Phelps. We offer to show this for the purpose of showing, with other facts, whether, at the time of this occurrence, this prisoner was justified by the circumstances in apprehending danger from the officer—whether he had any reason which, in his position, entitled him to

apprehend any danger from the officer at the time of the shooting."

" The Court. I do not think that would be proper."

" Judge Stuart. We offer to connect a knowledge on the part of the prisoner with the fact that the witness told the prisoner what Smedick had said, (so that when this event occurred he was advised of what Smedick had said about him.")

" The Court. The greatest extent to which that rule was ever carried was in a charge that I delivered to the jury in the case of *The People* v. *Cunningham.* I there charged the jury that they had a right to show the character of the deceased as a fighting man, as a wicked man, a blood-thirsty man, accustomed to carrying knives, accompanied with threats to take the life of Cunningham, provided they brought that knowledge home to Cunningham."

" If you can prove that this man said he was going to take his life, and that information was given to the prisoner, you can prove it."

" Judge Stuart. We propose to prove that the deceased had complained of the prisoner, had beaten him pretty near to death, had locked him up in prison and sworn falsely against him; and that, when he got out of prison, he said, ' The son of a bitch, is he out? I will fix him; I will have him there to-night again ;' and acting upon that, he pursued the prisoner. We will show that this witness was informed by Smedick of what he intended to do, and that he communicated it to this prisoner."

" The Court. I think this evidence at the present time is proper; and I did not intend to state to the jury, before charging them, what the law is on that subject. It is not as has been stated by the counsel for the prisoner, but is this: If information had been conveyed to the prisoner, the day before, that the police officer intended to arrest him, and put him in prison wrongfully, and he

thereupon armed himself and shot the officer, it is mur-
der." To which the counsel for the prisoner excepted.

It appears from this extract from the record, that while
the evidence was going on the court thought it necessary
to give the first installment of its charge to the jury. In
its first remark to the prisoner's counsel, the court really
intimated to the jury that unless the deceased was like
Cunningham—a fighting man, a wicked man, a blood-
thirsty man, accustomed to carry knives, and had made
threats against the prisoner's life, which had been com-
municated to the prisoner—the proof was incompetent;
but when the prisoner's counsel made the propriety of
their offer more plainly manifest, the court, while it al-
lowed the proposed evidence, assumed to charge the jury
in advance in reference to it.

Can it be law, as the court told the jury, (for it ad-
dressed itself to them,) that if the prisoner was informed
that the deceased intended to arrest him, and put him in
prison wrongfully, and the deceased meant to do it, (for
that is the implication of what the court said,) and the
prisoner thereupon armed himself and shot the deceased
when he attempted to execute his threat, it was murder?
What end can there be to official outrages, if this is law?
The remark of the court appeared to be intended as a
miniature of the most favorable state of facts the defense
could present, and warned the jury, by way of anticipa-
tion, not to be impressed by it, as the prisoner's act was
still murder.

It is not meant, in these suggestions, to overlook the
law laid down by the Court of Appeals in *The People* v.
*Clark,* (3 *Seld.* 385,) and *The People* v. *Sullivan,* (*Id.* 396,)
that the design to kill constitutes murder in the first de-
gree, whether it be formed months, or just before the
commission of the act producing death. It is incontro-
vertibly settled in this State, at this time, that it is suffi-
cient if the intent *antecedit ictum licet non congressum.* Still

this principle is to be understood reasonably, and is most happily presented in the opinion of Brown, J., in *The People* v. *McCann*, (16 *N. Y. Rep.* 58, 66, 68.)

In *Wilson* v. *The People*, (4 *Park. Cr. Rep.* 619,) in which Wright, J., delivered the opinion of the general term of the Supreme Court, the question of what justifies "heat of passion" is most perspicuously considered and ably handled. The judge, at the trial, had charged the jury that the use of words alone, even of the most aggravated character, would not be allowed, in law, to produce that "heat of passion" which, under the Revised Statutes, reduced an act of killing to manslaughter. Wright, J., in allusion to this instruction, expresses the convictions of the court in this language, (page 648 :) "Was the law, therefore, in this respect, correctly expounded? I think not. The law, respecting the infirmities of our nature, attaches a less degree of criminality to acts of violence perpetrated under an excitement provoked by the assailed. The passions may be heated as effectually by words as by acts; and an assault may be provoked oftentimes as readily by the former as the latter. In cases of assault of the person, it has always been held that provocation by words has gone far to mitigate the legal wrong. It cannot be that the accused must always show a combat and a sufficient provocation. It is enough that the passions are heated by the acts or conduct of the one upon whom the assault is made, and it matters not whether this state is produced by acts or words, if either the one or the other are naturally calculated to produce it." May not the deceased have provoked the prisoner by words, if not by violence? In the American Law of Homicide, (*Wharton,* 203,) it is stated as an elementary principle, in reference to restraint or coercion by a public official, that an illegal attempt to restrain a man's liberty, even under color of legal process, is such a provocation as to reduce the offense to manslaughter. The remark of the court below

was, that if the prisoner "thereupon (meaning on being informed of the threat of the deceased) armed himself and shot the officer, it is murder." Suppose this had been stated to the jury in the final charge, could it have been defended? Are the jury told that before the shot was fired, a design to kill, or premeditated malice, must have existed? The sting of this remark was not taken out of it by the final charge. The remark was, that to arm after the prisoner was informed of the threat, though he may have fired his pistol without a design to kill, was murder. The mere arming, if death followed, was murder. Is it not possible that though a man arm himself to repel menaced violence, he may, nevertheless, use his weapon with the same accountability, and no greater, as if he had had a weapon accidently about him when unexpected violence was inflicted upon him? On looking at the charge to the jury, it will be found that the attention of the jury was drawn exclusively to the crime of murder in the first degree. No definition of any other offense was given to them, unless it was when they were told that self-defense would reduce the act to manslaughter in the fourth degree. The trouble was that the jury were told they must either convict of murder in the first degree, or acquit altogether. That is the meaning of the charge. No intermediate point was given to them. Not feeling at liberty to acquit, they thought a recommendation to mercy would prevent death. Had the degrees of manslaughter been defined to them, it would have been different.

VI. The court, at the trial, erred in excluding the offer of the prisoner's counsel to show the previous cruelty of the deceased to the prisoner—clubbing him inhumanly on July 8, 1868, when almost insensible from intoxication—to justify an apprehension of similar treatment from the deceased at the time of the homicide. The ground of exclusion was that the defense could not "show isolated transactions of that kind." Carpenter, the principal wit-

ness for the prosecution, who pretended that he saw a portion of the affray from a stand-point of from twelve to twenty feet off, does not testify that no words passed between the deceased and the prisoner, or that he saw what happened between them, after he passed them. He did not remember hearing words, and did not know whether they spoke. They might have spoken, notwithstanding. In excluding the offer of the defense, by the witness McDonald, the court ruled directly against what it had previously ruled, in reference to the testimony of Mr. McGill. If it was competent to prove the threats of the deceased against the prisoner, was it not competent to prove the brutality of his conduct towards him? Two great principles must be here noted. *First.* "It is always a just argument, on behalf of one accused, that there is no apparent motive for the perpetration of the crime. Men do not act wholly without motive." (*Per Woodruff, J., in Kennedy* v. *The People,* 39 *N. Y. Rep.* 245, 254.) *Second.* "Our laws are not specially framed to shield guilt from detection. They exclude nothing legitimately connected with the *res gestœ* of crime. In cases of this nature such proof is uniformly received, and it is equally admissible whether it tends to inculpate or exonerate the party accused." (*Per Porter, J., in The People* v. *Gonzales,* 35 *id.* 49, 64.) In the *American Law of Homicide,* by Wharton, (*p.* 217,) it is stated as an elementary and familiar rule, that "it is admissible for the defendant (i. e., on a trial for murder,) to show threats, or other circumstances of a recent character, which would tend to make a man of his character believe that his life was in danger." (1 *Archb. Cr. Pr. and Pl.,* ed. by *Waterman, of* 1860, *p.* 901. *The People* v. *Henderson,* 28 *Cal. R.* 465.) On looking at page 249 of the same work, it will be perceived that any difficulty on this subject arises out of the inquiry as to whether the courts should permit the accused, on trials for homicide, to assail the general character of the deceased "for peace and order," where it is alleged that

the accused, "from all the circumstances of the case, had reason to be in fear of his life." (*Id.* 401, *in notis*.) The right to show particular malice—that which leveled itself directly at the accused—instead of constructive malice, which proceeded from a general ruffianly disposition, and involvod the whole world, is not questioned. (*Ben* v. *The State*, 37 *Ala. R.* 103, *N. S.*) In *Pfomer* v. *The People*, (4 *Park. Cr. Rep.* 558,) the counsel for the defense, on the trial, claimed the right to prove the general disorderly and offensive character of the deceased, without connecting a knowledge of it with the prisoner. The court decided to allow the testimony, if coupled with the offer to show that the fact was known to the prisoner; otherwise, excluded the testimony. On a verdict for manslaughter, the case was brought before the general term of this court, where the judgment was reversed on another ground; but the argument of the prisoner's counsel as to the point stated is reported *in extenso*, and will be conceded upon a perusal to be marked by great research and distinguished ability. The district-attorney conceded that the ruling of the court at the trial, with the restriction it imposed, (the bad character of the deceased being brought home to the knowledge of the accused) was good law. (*Id.* 589.) In *The People* v. *Rector*, (19 *Wend.* 569,) on a trial for murder, it was held per Nelson, Ch. J., and Cowen, J., (Bronson, J., dissenting,) where it appeared that the deceased sought to gain admittance into a house of ill-fame by violence and against the will of the keeper thereof, who made an attack upon the aggressor, and death ensued, that testimony that threats had been made a week previous to the assault, by persons who had broken into the house, that they would return some other night and break in again, might be received and submitted to the consideration of the jury, under the instruction of the court; although it seems that for the rejection of such evidence, where it was not shown that the deceased was of the party who made the threats,

a new trial would not be granted. If the deceased had been shown to be of the party making the threats, a new trial would have been granted as a matter of right. Cowen, J., (*Id.* 590,) says: "It did not appear that he (the prisoner) knew the deceased and his companions, so as to distinguish them from the previous rioters. * * * The lightness of a relevant circumstance is no argument for withholding it from a jury. (*Id.* 591.) * * * In the prosecution of a crime so essentially the creature of intent as murder, everything pertinent should be submitted to the jury upon which they may infer an absence of malice." (*Id.*) Nelson, Ch. J., speaking of the proof having been offered to show that the prisoner, under the influence of an apprehension of violence upon his dwelling and its inmates, had used a degree of violence which was excusable, though otherwise it might have been disproportioned to the actual danger, says: "that the law regards this sort of palliation for an excess of resistance, in case of an unlawful assault upon the person or property of the citizen, is not denied." (*Id.* 614.) In *The People* v. *Lamb*, (2 *Keyes*, 360, 366,) Davies, Ch. J., sustains the doctrine he had ruled in *The People* v. *Pfomer*. He also enunciates the principle that the general character of the deceased can be attacked, and that he can be shown to have been disorderly, violent, dangerous or blood-thirsty, under the decisions he consulted, where it appeared that he.had assaulted the prisoner, or threatened to assault him at the time of the homicide, ("or so immediately preceding it, or so intimately connected with it,") in such a way as to justify the apprehension of great, impending and imminent bodily harm. (*Id.* 365, 371.) In that case the Court of Appeals affirmed the judgment of the general term of the Supreme Court in this district, granting the prisoner a new trial, although, from the opinions delivered, it cannot be gathered which of the grounds considered in them was meant to be passed upon by the court. In *Jewett* v. *Ban-*

*ning*, (21 *N. Y. Rep.* 27,) it was held that "in an action for an assault and battery, committed in the absence of witnesses, ill will on the part of the defendant towards the plaintiff is admissible as a part of the circumstantial evidence "to determine by whom the assault was committed." If ill will generates a rule of evidence in the civil courts, why does it not also in the criminal courts? If it becomes a make-weight in the scale in the former class of cases, why does it not also become one in the latter?

VII. The court, at the trial, erred in excluding the questions to James Rowe, a witness for the prisoner, as to the impressions the acts and words of the prisoner made or left upon his mind, when he had the conversation, and walked with the prisoner, between five and eight o'clock, on the afternoon or evening previous to the homicide. The rule is thus stated by Porter, J., in *Clapp* v. *Fullerton*, (34 *N. Y. Rep.* 190, 194, 195:) "When a layman is examined as to facts, within his own knowledge and observation, tending to show the soundness or unsoundness of the testator's mind, he may characterize as rational or irrational the acts and declarations to which he testifies. It is legitimate to give them such additional weight as may be derived from the conviction they produced at the time. The party calling him may require it to fortify the force of the facts, and the adverse party may demand it as a mode of probing the truth and good faith of the narration. But to render his opinion admissible, even to this extent, it must be limited to the conclusions from the specific facts he discloses. His position is that of an observer, and not of a professional expert. He may testify to the impression produced by what he witnessed; but he is not legally competent to express an opinion on the general question, whether the mind of the testator was sound or unsound." This same rule was restated and reapplied in *O'Brien* v. *The People*, (36 *N. Y. Rep.* 276, 282.) It is now the settled law of this State.

VIII. The court, at the trial, committed a similar error in excluding the questions to Thomas Mulhare, another witness for the prisoner, who testified to facts occurring before and up to half-past six o'clock on the afternoon of the occurrence in question, utterly inconsistent with any other idea, if true, than that the prisoner was not right in his mind. It cannot be insisted that the exclusion of these questions did not prejudice the prisoner, for why did the prosecution object to the answers, if they were not damaging to their interests? Why not receive the evidence, if it was unimportant?

IX. The court, at the trial, erred in excluding the following question to Patrick McCauley, the prisoner's brother-in-law, who had been familiar for the last fifteen or sixteen years with the prisoner's habits of intoxication or drinking to excess, namely: "What have been his habits lately as to excessive drinking?" At the time this question was put, the evidence of Mr. Rowe and Mr. Mulhare had been given. It proved a condition of mind on the part of the prisoner, on the evening before, and on the very afternoon of the occurrence, certainly not very rational, if it did not amount to absolute mental derangement for the time being. The effect having been proved, the cause necessarily became relevant. The latter would have enabled the jury to have judged of the extent and intensity of the former. In *O'Brien* v. *The People*, (*supra*,) delirium tremens is accepted by the court as actual insanity, occasioning irresponsibility for the conduct of a party while it lasts. If the proof failed to draw the case up to that standard, the state of the prisoner's mind became important as showing whether the expressions he made use of or uttered (as alleged by the prosecution) at the time of his arrest, were really understood and meant by him, or were the promptings of an intellect totally or partially shattered by previous dissipation or indulgence. Insanity is predicable of such a state of mind on the part of a person

charged with homicide, as prevents his knowing "that the deed was unlawful and morally wrong." (*Per Denio, Ch. J., in Willis* v. *The People,* 32 *N. Y. Rep.* 715, 719.) It would not be wrong to say that a person was insane who did not know right from wrong at the time of the homicide, and that the act he was committing was a violation of law, and wrong in itself. (*Id.*) The dialogue between the court and counsel for the prisoner is somewhat lengthy at this point, but it amounted to a positive refusal by the court to allow the question as to the habits of the prisoner lately as to excessive drinking to be put, and an exclusion of the fact of intoxication at the time of the homicide. If the remark of the court, "If you can show that he had the delirium tremens at or about this time, you can show it by this witness or any other witness," cured the two previous exceptions for the prisoner at this stage of the trial, on this subject, it did not affect them so far as they embraced the two facts mentioned. As to the excessive drinking, what so perfect a way of establishing delirium tremens, as to show the habits claimed to have begotten the disease? The prisoner's counsel wanted to prove "that he was addicted to drinking; sometimes drank to a great excess, and continued on drunken sprees for days and weeks at a time, and then sobered down, and had a delirium and insanity." Should not the cause have preceded the effect, in the order of testimony? The excessive drinking was the cause; the insanity the effect. Did it not corroborate Rowe and Mulhare, to prove that the conduct of the prisoner, as they witnessed it on the night before and the day after the occurrence, had no actual foundation to rest on; that the prisoner must have been in the condition they described, unless excessive drinking had been shorn of its power or influence? It is difficult to see why the court kept out evidence as to excessive drinking. It is certain, however, that it did, unless, so far as it allowed delirium tremens to be established, excessive drinking was involved

in the establishment of that fact. As to the prisoner's intoxication at the time of the alleged offense, the exception to the decision of the court is perfectly fatal. He had the undeniable right to show it, if three decisions of the Court of Appeals can create such a right. In *The People* v. *Eastwood* (14 *N. Y. Rep.* 562, 565) the doctrine is distinctly upheld by the Court of Appeals, that where a party charged with murder has indulged in threats or violent language, the fact of intoxication is receivable on the point of whether the threats and language used were the deliberate words of a sober and bad man, or the idle and coarse language of a drunken man. In *The People* v. *Rogers* (18 *id.* 9) the doctrine is distinctly approved by Denio, J., in his opinion, (*p.* 18,) with the views of which the members of the court unanimously concurred, that drunkenness or intoxication is admissible to show that a death occurring after provocation was the result of passion, and that it is also proper to be considered where the question is whether words have been uttered with a deliberate purpose, or are merely low and idle expressions. That eminent jurist expresses himself in this ever to be remembered sentence, "It must generally happen in homicides committed by drunken men, that the condition of the prisoner would explain or give character to some of his language, or some part of his conduct, and, therefore, I am of opinion that it would never be correct to exclude the proof altogether." (*Id.* 19, 20.) *Kenny* v. *The People* (31 *id.* 330) affirms and reapplies the doctrine of the *People* v. *Rogers*. The prisoner there was allowed to show his drunkenness or intoxication at the time of the offense. (*Id.* 335.) How potent would the fact of intoxication have been before the jury, in showing the state of mind of the prisoner in the conversation with officer Mee at the time of his arrest, or in explaining his statements at the station-house, as testified to by Sergeant McConnell and Captain Allaire, or the still more fearful statements put in his mouth by that *happy*

witness, officer Lambrecht. What he said on those occasions would have been seen by the jury, through the medium of that fact, to be mere idle, unmeaning bluster, not emanating from the heart, and disentitled to any weight whatever.

X. The court, at the trial, erred in excluding the offer of the prisoner's counsel, on the examination of Mr. McCauley, as follows: "Judge Stuart: I also propose to show, under your honor's ruling, that Smedick bruised and beat the prisoner to the peril of his life on several occasions prior to the killing, and that he also made threats of violence against him, and I propose to bring the knowledge of that (these threats) to the prisoner." This point, it will be observed, is stronger than point VI, because the exception embraces an offer to show threats of violence, on the part of the deceased, against the prisoner, and that those threats were communicated to the prisoner. This knowledge must have, more or less, influenced the feelings and conduct of the prisoner in meeting the deceased, and particularly if the deceased attempted any violence upon him.

XI. The court, at the trial, erred in allowing the questions, on cross-examination, to Henry Real, as to what he had been arrested for, whether he had ever been in the penitentiary, and how long he had been there. It was in direct conflict with *Newcomb* v. *Griswold*, (24 *N. Y. Rep.* 298.) It is true the court told the witness that he need not answer if he did not want to, but the decision cited says that " if the question ought not to be asked, the objection cannot be referred to the privilege of the witness."

XII. The court, at the trial, erred in refusing to charge the jury that if the proof failed to show which wound it was that actually killed, the case was not made out according to the indictment. The evidence of Dr. Beach showed that there were two wounds upon the body of the deceased, and but two; so that the story of three shots having been

seen fired at and into the deceased is not true, if this circumstance, which cannot but be true, is relied upon. The statement that officer Lambrecht put into the prisoner's mouth, "I put three balls in him," is not sustained by this circumstance either. One thing is certain, if the prisoner was as close to the deceased as he was testified to have been, and was perfectly sane, he ought to have known how many balls entered the deceased. One of the wounds was where a ball entered just about in front of the ear, passing directly through the head, and emerging at the other side just opposite the ear. The other was where a ball entered a little to the right of the breast bone, and then "went directly through backwards." Either was sufficient to have produced death. The hemorrhage from either was sufficient to have caused it. The testimony could not show which wound was inflicted first, nor which wound was the immediate cause of death. The indictment contained but one count, founded upon death from the wound in the head. If the deceased did not die from that cause, the prisoner could not be convicted, under the indictment. In *The People* v. *Tannan*, (4 *Park. Cr. Rep.* 514,) where the prisoner was indicted for killing the deceased by beating and striking him, and it appeared that he and the deceased had had a regular fight by appointment, resulting in the death of the deceased, Ingraham, J., before whom the prisoner was tried, instructed the jury that if the deceased came to his death from injuries received by falling on a mound of earth, and not by the beating and striking, they should acquit him, under the indictment. In one of the rounds in the fight, the evidence showed that the deceased was violently thrown upon a mound of earth, and that the injury therefrom could have produced death. That is *quatuor pedibus* with this case. The rule in reference to proving the mode of death laid in the indictment is this: If the act of the prisoner and the means of death proved agree in substance with those alleged, the

nature of the violence and the kind of death occasioned by it being the same, a mere variance as to the nature or kind of instrument used will not be material. (3 *Chitty's Cr. Law,* 734, 735, 736, *m. p.*) The present indictment should have contained two counts; one, framed upon the wound in the head; the other, upon the wound in the body. If the evidence in this case did not show, beyond all peradventure, that the deceased died from the injury in the head, the prisoner could not be convicted under the indictment. Until our courts hold that an indictment need not set out the injury that caused death and dispense with one of its fundamental attributes, the present exception must be sustained. It would hardly be in place, in asking, as we do, that the prisoner have another chance for his life, to say

*Una spectanda justitia, nihil præterea,*

to those who occupy "*judicii locum,*" the judgment seat. The responsibility, however, is upon the court of approving the law which conduced to the verdict of the jury. While technicalities should not serve unduly to screen those who have forfeited their lives and liberty for the good of the community, it should be remembered that the judicial action of to-day becomes a precedent for that of to-morrow, and that judicial certainty, consistency and stability, are absolutely indispensable to the safety, and needed for the protection, of innocence and virtue.

*S. B. Garvin,* for the defendants in error.

*By the Court,* CLERKE, P. J. I. The first point taken by the counsel of the plaintiff in error involves the question of jurisdiction. It appears from the judgment record that the indictment was presented in the court of general sessions on the first Monday of August, 1868; that on the 6th day of the same month the said court ordered that the indictment be sent to the next court of oyer and term-

iner to be held in and for the city and county of New York, there to be determined according to law; that on the 1st day of February, 1869, the indictment was accordingly sent to, and received by, the court of oyer and terminer, to be determined according to law; and afterwards, on the 10th of February, in the same year, at the said court, before a jury for the purpose impanneled and returned, the plaintiff in error was convicted of murder in the first degree, as in° the indictment was alleged against him.

· The counsel for the plaintiff in error states, in his 1st point, that it is not alleged that the session of the court, where the prisoner was tried, was the court next after the 6th of August, 1868, when the transferring of it to the court of oyer and terminer was made; and he says that it was conceded on the trial that the next court of oyer and terminer sat in October, 1868. On referring to the error-book, I cannot find any such concession. No doubt Mr. Stuart, counsel for the prisoner, in stating his objection to the jurisdiction of the court, affirms that a court of oyer and terminer had been held in the previous October; and he is not contradicted, either by the court or the opposing counsel. We, however, can alone be guided by the record; and from all that there appears, we cannot infer that a court of oyer and terminer was held in October, 1868; but, on the contrary, it is to be inferred that the court next after the 6th of August was held in February, 1869, when the prisoner was tried. But if a court had been held in October, I do not think it was indispensable that he should have been then tried. Undoubtedly the statute (3 *R. S.* 303, *5th ed.*) directs, in the 6th section, that the courts of sessions shall send all indictments, not triable therein, to the next court of oyer and terminer, there to be determined according to law; and in the 7th section, the one applicable to the case before us, it says that the said courts may, also, by an order to be

entered in their minutes, send all indictments for offenses triable before them, which shall not have been heard and determined, to the next court of oyer and terminer, to be there determined according to law. Does this necessarily require that the prisoner shall be tried during the next session of the court, and, if not then tried, that he shall not be tried at all? It appears to me that the language of the statute does not, peremptorily, require that the trial shall take place at any particular term or session. It shall, indeed, be sent to the court held next after the time when the order of transferrence had been made; but when it says *there* to be determined according to law, it does not mean *then*, at that particular term or session. It still, as on all occasions, leaves the control of the calendar with the presiding judge; and he retains the power which every judge necessarily possesses, of reserving the case, or postponing the trial, for another term or session, as the exigencies of the occasion or as justice may require. The counsel for the plaintiff in error refers us to *Quimbo Appo* v. *The People*, (20 *N. Y. Rep.* 531,) in which the judge who wrote one of the opinions in the Court of Appeals remarks, that "the court of oyer and terminer is a permanent and continuous court, existing in its appointed and stated terms." But the counsel, if he had read further, could have added the next sentence in the opinion, in which the judge says : "Its successive sessions are terms of the same, and not distinct tribunals;" and being so, being one identical continuous tribunal, it has, undoubtedly, power, like any other tribunal, to reserve or postpone a case for trial, at any one of its terms; whether it originated there or was transferred to it from any other co-ordinate or subordinate tribunal. I think this point, therefore, not well taken.

II. And the same reasoning and conclusion will apply to the 2d and 3d points; which I consider, consequently, equally untenable.

Real *v.* The People.

III. The counsel for the prisoner asked permission to inquire of Mee, a patrolman, and a witness called on behalf of the prosecution, what the prisoner said to him, the day after he was arrested. This was overruled, and correctly overruled. The intended question applied to language alleged to have been uttered by the prisoner, at a totally different time and place from those when and where the offense was committed, or when and where the first declarations of the prisoner were made. The language was therefore no part of the *res gestœ*. If unsworn declarations of the perpetrator of crime, after he had time to consider and concoct an excuse, were to be received as evidence, he would, in all cases, be able to manufacture an available defense for himself, if they were to be regarded at all by the jury; and if they were not to be regarded by the jury, it would be utter waste of time to receive them at all. The counsel for the plaintiff in error insisted, on the argument, that the declarations were admissible on the ground that this witness had testified, on the direct examination, that the prisoner had admitted first to him alone, on the arrest, and again at the station-house to the captain, in his presence, that he had killed Smedick; and having made these admissions, the counsel consented that the prisoner was entitled to the benefit of any further declarations made in explanation of the admissions at a subsequent period, as "some kind of counteractive for these admissions." The counsel, quoting the language of the counsel for the prisoner at the trial, as follows, "Now I ask permission that I may ask the witness what the prisoner said *next day*," insists that the meaning of this was, permission to ask the witness what reason the prisoner assigned for his act, because it was as fair from officer Mee's testimony to presume that he said it on the night and at the time of the arrest, when he admitted the act itself, as that he said it the next day. But there was no such presumption involved, expressly or impliedly, in

the terms of the proposed question. This question sought for the declarations of the next day, not for the explanation, if any, of those made on the night of the arrest. If the counsel, on the trial, wished again to ask the witness if the prisoner, at the several times when he admitted his guilt, also mentioned the reason why he committed the offense, I suppose he would have been permitted to do so; although the witness had expressly said he did not remember that the prisoner had stated any reason at the times he made the admission. Yet no doubt he would have been permitted to refresh the memory of the witness on this subject if he was able to do so. But, as I have said, the proposed question did not import anything of this kind; it was confined, in express terms, to what the prisoner had said the day next after the commission of the offense.

IV. McGill, a witness for the prisoner, was asked to state what the deceased had said to him about the prisoner, in the latter part of June or about the 1st of July, 1868. This was professedly offered "for the purpose of showing, with other facts, whether, at the time of this occurrence, the prisoner was justified by the circumstances, in apprehending danger from the officer." This presupposes that the mere apprehension of danger justifies the killing of the person from whom it is apprehended. I have no doubt that such an apprehension gives rise to many of those street shootings which occur so frequently in lawless districts; but I need scarcely say that the law has never sanctioned any such conduct, but emphatically condemns and brands it as murder in the first degree. The alleged threat of the deceased was made during the latter part of June or the beginning of July; the deceased was killed on the 23d of the latter month. The law justifies homicide only when an actual attempt has been made to murder the person committing it, or to commit any felony upon him, or upon or in any dwelling-house in

which such person is, or in the lawful defense of such person, or his or her, wife, husband, parent, child, master, mistress or servant, when, at the time of the attempt, there is reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and when there is imminent danger of the accomplishment of such design. But apprehension of a previous threat, followed by no *overt* act, surely does not justify homicide. Such a homicide, I repeat, the law pronounces to be murder in the first degree; while, at the same time, it affords an effectual remedy to the person against whom the threat is made, to protect him from danger, reasonably apprehended.

V. The same remarks, and the same course of reasoning, will apply to the 6th point of the counsel of the plaintiff in error. Previous bad treatment will not, any more than previous threats, justify homicide. The law affords redress for the one as it affords a remedy for the other; and in neither case is the person injured or threatened, to be his own avenger.

VI. The counsel for the prisoner, at the trial, asked the witness Rowe, "From what you saw of him that night, (the night previous to the murder,) what impression did his acts and words make upon your mind; what impression, as to the state of his mind, did his words and conduct have upon your mind?" This required the witness to state, from his observation of the whole language and demeanor of the prisoner, his opinion relative to the general soundness of his mind. The object of it, I suppose, was to show that the prisoner, at the time of the commission of the offense, was laboring under *delirium tremens.* This the court afterwards expressly told his counsel he was at liberty to show; and the witness, previously to the putting and rejection of the question, gave some evidence tending to show that the prisoner was in such a condition, on the evening preceding the murder; he said he thought

that the prisoner then had the horrors. But a non-professional person is not capable of satisfactorily answering such a question as that proposed, calling for his opinion as to the general soundness or unsoundness of the prisoner's mind. The case referred to by the counsel does not, in my opinion, sustain his proposition, (*Clapp* v. *Fullerton*, 34 *N. Y. Rep.* 190.) The judge who delivered the opinion in that case undoubtly went very far; there is no reason, however, to infer from his language that he meant to overrule the well established and only safe rule, that the opinion of a witness is, in general, not evidence. The witness must speak to facts; while on questions of science or trade, or others of the same kind, persons of skill may speak not only as to facts, but may also give their opinions. In the case referred to, the judge says that to render the opinion of an unprofessional witness admissible, even to the extent stated, it must be limited to his conclusions from the specific facts he discloses; and this the witness in the case before us did, by saying that he thought the prisoner had the horrors on the night previous to the homicide. His opinion as to the general soundness or unsoundness of the prisoner's mind was, I think, properly rejected.

VII. These observations apply with equal force to the counsel's 8th point.

VIII. The counsel of the prisoner, at the trial, offered to prove that the prisoner was addicted to hard drinking; that he sometimes drank to great excess, and continued on drunken sprees for days and weeks at a time, and had had delirium and insanity. The court asked whether the counsel proposed to show that within two or three days previous to the homicide he had one of those fits on him. The counsel replied that he did not propose to show that, by the witness, but proposed to lay a foundation to prove it. The court ruled out the question, and, afterwards, told the counsel that if he could show that the prisoner had

*delirium tremens,* at or about the time of the homicide, he could show it by this or any other witness. The counsel remarked that he proposed to show the drinking first. The course prescribed by the court renders the objection untenable.

IX. The observations and reasoning which I have stated in relation to counsel's 5th and 6th points, apply to the 10th point. Whether the alleged threats were or were not communicated to the prisoner, the homicide was not justifiable.

X. Henry Real, a witness called on behalf of the prisoner, was asked, on the cross-examination, by the counsel for the people, whether he had ever been arrested in New York; he said he had. He was then asked whether he remembered what it was for; this was objected to, by the counsel for the prisoner; and it was not answered. He was then asked if he had ever been in the penitentiary. This was also objected to by the counsel for the prisoner. The court remarked to the witness that he need not answer if he did not think proper to do so. There seems to have been no exception by the counsel of the prisoner to the admission of the question by the court; and the witness proceeded to answer, saying, "I will tell the truth; I was in the penitentiary." Then the counsel for the people asked him, "How long there?" The question was objected to by the prisoner's counsel; the objection was overruled; and then the counsel duly excepted. The only question which we are called upon to consider, no exception to the rulings of the court having been taken, is as to the leading question put to the witness in relation to his imprisonment in the penitentiary. There is no point appertaining to the rules of evidence on which greater diversity of opinion exists than upon questions calling for answers having a tendency to degrade the character of a witness. I think, however, now, that the conflicting authorities on

this subject may be deemed reconciled. Where, as in *Newcomb* v. *Griswold,* (24 *N. Y. Rep.* 298,) the witness was asked, on the cross-examination, whether he had been convicted of petit larceny, although the opposite party, alone, and not the witness, objected, it was held that the party has a right to insist that the conviction be proved by the record; because this is the only proper way of proving a conviction. But where, as in the *Great Western Turnpike Co.* v. *Loomis,* (32 *N. Y. Rep.* 127,) the question called for an answer calculated to disparage the witness, and not directly to prove a conviction, it was held that such questions should be allowed or disallowed by the court in the exercise of its discretion; and that the ruling is not subject to review, unless in cases of manifest abuse or injustice. In the case before us, the witness having answered that he had been in the penitentiary, although the court informed him that he was not bound to answer, and the counsel for the prisoner having taken no exception, was then asked, "How long there?" This was not calling for proof of his conviction, nor did it involve the question of his conviction, which could be proved only by the judgment record; although his being in the penitentiary presupposes a conviction. But, having admitted, without due exception on the part of the prisoner's counsel, that he had been there, an answer showing the duration of the time of his imprisonment was, if it was capable of producing any effect, calculated merely to disparage him. The answer which was in fact given, if believed at all by the jury, must have been favorable rather than prejudicial to him. He answered, "four months;" and he added, "innocent of the crime."

XI. The counsel for the plaintiff in error, in his 12th point, maintains that the court erred, at the trial, in refusing to charge the jury, as requested by the prisoner's counsel, that if the proof failed to show which wound it

was that actually killed the deceased, the case was not made out according to the indictment. The indictment charged, in substance, that the prisoner made an assault, and with a pistol charged and loaded with gunpowder and a leaden bullet, fired at the deceased, and then and there feloniously, and of his· malice aforethought, did strike, penetrate and wound the deceased with the leaden bullet; causing a mortal wound of which he died. This the prosecutor was bound to prove; but it mattered not which of the bullets, and which of the wounds, caused the death of the deceased. Whichever bullet caused his death, it was fired off by the prisoner, out of a pistol held and discharged by him, and inflicted a wound, which caused the death of the deceased. This 12th point, therefore, like all the others, I hold to be untenable.

I have thus patiently and carefully considered all the numerous points, with the introduction and voluminous comments of the counsel of the plaintiff in error. I have a conviction that the conclusions at which I have arrived, in relation to these points, are incontrovertible. But I am convinced if I have erred, and if any of the rulings of the court, at the trial, were erroneous, that the error did not affect the substantial rights of the prisoner. If the rulings were the other way, it is not within the range of legal possibility that the result could have been different. The perpetration of the frightful act itself, the deliberation with which it was executed, the cruel vindictiveness which instigated and accompanied it, the absence of mental alienation, except what was caused by the tumult of malign passions, were so satisfactorily proved, that whatever disposition the court made at the trial, of the various objections and requests of the prisoner's counsel, the jury could not, without a grave dereliction of duty, have rendered any other verdict than that which they did render. The doctrine that the court shall disregard any error or defect in the pleadings or proceedings which has not affected the

substantial rights of the adverse party, and that no judgment shall be reversed or affected by reason of such error or defect, is salutary and just, equally in criminal as in civil cases. It will make the administration of justice easy and efficient, the triumph of mere technicality almost impossible, and the impunity of criminals, it may be reasonably hoped, of rare occurrence.

The judgment of the oyer and terminer should be affirmed.

[NEW YORK GENERAL TERM, June 7, 1869.   *Clerke, Geo. G. Barnard* and *Cardozo,* Justices.]